EXHIBIT A

**Filed**
**D.C. Superior Court**
**06/30/2016 13:16PM**
**Clerk of the Court**

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, a non-profit corporation, 170 East Cotati Avenue, Cotati, CA 94931,<br><br>    Plaintiff,<br><br>  v.<br><br>HORMEL FOODS CORPORATION, 1 Hormel Place, Austin, MN 55912,<br><br>    Defendant. | Case No. 2016 CA 004744 B<br><br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff Animal Legal Defense Fund ("ALDF"), a non-profit organization, by and through its counsel, brings this action against Hormel Foods Corporation ("Hormel") and alleges the following based upon information, belief, and the investigation of its counsel:

### INTRODUCTION

1. "Natural" food products are big business.

2. Due to concerns about health, sustainability, and animal welfare, consumers are increasingly factoring into their purchasing decisions the origins of their food, along with the presence of certain additives.

3. The growing desire for "natural" meat products is part and parcel of these trends.

4. Among other factors, consumers are concerned about how animals are raised, whether animals have been fed or implanted with hormones and other drugs, how animals are slaughtered, how food products are processed, and the nature of any additives.

5. Given these concerns, consumers are increasingly seeking out meat products

1

advertised as "natural."

6.      Reasonable consumers believe that the term "natural" means that the animals were raised using sustainable farming techniques on independent family farms—as opposed to the modern industrial, pharmaceutical-dependent agriculture known as "factory farming"—and that the products are free of artificial ingredients.

7.      Sixty-five percent of consumers believe that "natural" also means that no artificial ingredients or colors were added to the meat during processing.

8.      A majority of consumers believe that meat products advertised as "natural" have no added color and are made from animals that were not given artificial growth hormones, were not fed artificial substances, and were fed non-GMO feed.

9.      In addition, a majority of consumers believe that meat products advertised as "natural" were never given antibiotics or other drugs; and that the animals went outdoors.

10.      Seeking to capitalize on these consumer beliefs and preferences, Hormel launched its Natural Choice line of lunchmeats and bacon in 2006, and recently reintroduced the products through a national advertising campaign, using the slogan "Make the Natural Choice."

11.      Hormel's "Make the Natural Choice" marketing campaign urges consumers to purchase Hormel's products, claiming that consumers can get, at affordable prices, "all natural" meats that have no added preservatives or added nitrates.

12.      Hormel reinforces its Natural Choice branding with assurances that the products are "safe," "clean," raised "within a local 400-mile radius," and meet "higher standards."

13.      Hormel's Natural Choice product line has been hugely successful.

14.      There is nothing natural about the way Hormel's Natural Choice products are produced.

2

15.     Hormel makes no distinction between the way the animals destined for its various product lines, whether Natural Choice or any other, are raised and slaughtered.[1]

16.     Animals raised and slaughtered for Hormel's product lines, regardless of whether or not they ultimately become Natural Choice products, are raised on industrial, pharmaceutical-dependent factory farms.

17.     The animals used by Hormel are raised completely indoors in abusive conditions and given hormones, antibiotics, and other drugs.

18.     Animals destined for Natural Choice and other Hormel product lines are sent to the same processing facilities, where they are slaughtered in the same inhumane and unsanitary way.

19.     Despite Hormel's express advertising claims that the Natural Choice products have "zero preservatives," Hormel adds nitrates and preservatives to the products during processing.

20.     Most Natural Choice products contain cultured celery juice powder, a preservative that is high in nitrates.

21.     On information and belief, "cultured" refers to a bacterial culture, which converts the sodium nitrate contained in celery juice powder to sodium nit*rite*, also a preservative.

22.     Not only is Hormel taking advantage of consumers' perceptions of what "natural" means; it is also taking advantage of consumers' unfamiliarity with the preservative- and nitrate-laden properties of celery juice powder.

23.     Because Hormel's "Make the Natural Choice" advertising campaign tends to

---

[1] On information and belief, the only exception to this is Applegate Farms, which Hormel purchased in July 2015. The Applegate brand is "operate[d] autonomously as a stand-alone subsidiary within the company's Refrigerated Foods segment" (*see:* http://www.hormelfoods.com/Newsroom/Press-Releases/2015/07/20150713, last visited June 27, 2016), and is maintained through an entirely separate supply chain from Hormel's other product lines.

3

mislead and is materially deceptive about the way in which the animals are cared for and the artificial substances added to the meat, Plaintiff brings this suit for injunctive relief under the District of Columbia Consumer Protection Procedures Act ("DC CPPA"), D.C. Code § 28-3901 *et seq.*

## JURISDICTION AND VENUE

24.     This Court has personal jurisdiction over the parties in this case. ALDF maintains a presence in the District of Columbia and, by filing this Complaint, consents to this Court having personal jurisdiction over it.

25.     The Court has personal jurisdiction over the defendant because Hormel has purposefully directed its conduct to the District of Columbia and availed itself of the benefits and protections of District of Columbia law.

26.     This Court has subject matter jurisdiction over this action under the DC CPPA, D.C. Code § 28-3901, *et seq.*

27.     Venue is proper in this Court because Hormel aims its "Make the Natural Choice" advertising campaign at the District of Columbia. On information and belief, Hormel's print advertisements appear in magazines and newspapers delivered to District of Columbia residents and available for purchase in District of Columbia stores. On information and belief, Hormel's internet advertising is accessible in the District. Hormel Natural Choice products are available for purchase in the District of Columbia.

## PARTIES

28.     Plaintiff Animal Legal Defense Fund ("ALDF") is a national non-profit organization headquartered in California. ALDF has some 750 supporters and 400 donating members residing in the District of Columbia. ALDF conducts significant activity in the District,

from offering an up-to-date compendium of the District's animal protection statutes, to working with members of ALDF's Volunteer Attorney Network at D.C.-area law firms, to providing resources to Student Animal Legal Defense Fund chapters at D.C. law schools, including Georgetown and George Washington Universities.

29.     ALDF has spent more than three decades focusing on animal protection issues, including animals used for food, and the law. In addition to litigation, ALDF engages in public advocacy, education, legislative lobbying, development of animal law as a legal field, and legal education. ALDF's groundbreaking efforts to end the suffering of abused animals are supported by hundreds of dedicated attorneys and more than 200,000 members and supporters.

30.     ALDF is heavily involved in protecting the well-being of animals used and sold in commercial enterprises, including agriculture, and especially "factory farming." Among its expenditures aimed at stopping factory farming and limiting its harms, ALDF has filed rulemaking petitions about the animal welfare, consumer safety, and public health effects of antibiotic and other veterinary drug use by the meat industry, and about the misleading labeling in the egg and foie gras industries.

31.     Advocating for transparency in the meat industry and truth in meat and poultry advertising is central to ALDF's mission for at least two reasons. *First,* disseminating truthful information about the cruelties suffered by animals on factory farms, along with the pharmaceutical dependence such conditions require, leads consumers to boycott and buy less meat from such sources, resulting in fewer animals being raised and slaughtered in terrible conditions. *Second,* false and misleading meat advertising perpetuates animal suffering by distorting the marketplace, injuring both more natural, humane competitors who spend money improving the welfare and living conditions of farmed animals, and the consumers who desire to

5

patronize these farms and rely on companies' representations when making their purchases.

32.     Thus, for many years, ALDF has pursued petitions, campaigns, lawsuits, and outreach efforts to address misleading meat and poultry labeling and advertising, including, among other efforts:

- advocating for robust and meaningful standards for the "natural" and organic labels for meat and poultry that are aligned with consumer expectations,

- stopping false advertising by meat producers, from foie gras sellers to chicken companies, and

- educating consumers about the truth behind meaningless and misleading labels and advertising by meat companies.

33.     ALDF has expended substantial organizational resources pursuing these efforts to combat misleading meat and poultry labeling and advertising, including:

- filing administrative petitions and lawsuits,

- preparing comments in response to proposed federal rulemaking,

- conducting undercover investigations of factory farms,

- publishing email and print newsletters,

- producing online resources, and

- conducting social media campaigns.

34.     ALDF's communications department has spent significant resources raising awareness of the harms that false meat advertising, such as the marketing and advertising perpetuated by Hormel, inflicts on animals, consumers, and competitors. For example, ALDF has issued press releases and initiated online petitions to advocate for reforms to the "natural" labeling claim on meat and poultry and for the mandatory labeling of antibiotic use for meat and

poultry products derived from animals given non-therapeutic antibiotics.

35.     ALDF's work has been frustrated by the rampant presence in the marketplace of meat labeled and advertised as "100% natural" or "all-natural" that is anything but—products derived from animals raised in the most unnatural and cruel conditions, cramped together in cages or pens indoors, and fed a steady diet of antibiotics and other veterinary drugs.

36.     ALDF's mission of promoting transparency in animal agriculture and truth in meat labeling and advertising has been specifically impaired by Hormel's massive "Make the Natural Choice" campaign of advertising meat and poultry from animals raised on industrialized factory farms and dependent on pharmaceuticals as "all natural," "natural," or a "Natural Choice."

37.     Because of Hormel's "Make the Natural Choice" advertising blitz, ALDF has had to devote substantial additional organizational resources to counteract the misinformation, educating consumers about this and other "natural" claims, advocating for stronger standards for the "natural" claim that fall in line with consumer expectations, and publicizing the truth about Hormel's farming practices. This misleading advertising of "Natural Choice" products has caused ALDF to divert its organizational resources away from other priorities and campaigns that could have protected more animals. The injury to ALDF is not speculative; instead, expenses incurred by the efforts described above, which resulted from Hormel's unlawful conduct, could have been spent in ways that better furthered ALDF's mission had Hormel not launched its misleading "Make the Natural Choice" campaign.

38.     The above-described diversion of resources to counter Hormel's advertising blitz has injured ALDF's organizational mission by harming its ability to combat cruelty and evasiveness in the animal agriculture industry. ALDF could have avoided the expenditures

7

related to these "natural" claims, and pursued work that more directly advanced its mission, including other litigation, education, and outreach campaigns to protect animals, had Hormel not been falsely advertising its products as the "Natural Choice."

39.     If Hormel were to cease its "natural" advertising claims and its "Make the Natural Choice" advertising campaign, including by the injunctive relief sought through this action, ALDF would not have to continue diverting these organizational resources to warn consumers and educate the public about Hormel's products and farming practices, and could redirect these resources to other projects, in furtherance of ALDF's mission.

40.     Defendant Hormel Foods Corporation is a domestic corporation incorporated and headquartered in Austin, Minnesota. Hormel produces numerous lines of pre-packaged food products, including Spam and other canned meats, refrigerated meat entrees, microwave meals, and the Natural Choice lunchmeats and bacon at issue here.

## FACTUAL ALLEGATIONS

### I.     CONSUMER EXPECTATIONS

41.     Research demonstrates that (1) most consumers believe that "natural" means that the animals were not subject to industrial, pharmaceutical-driven factory farm conditions; that (2) it is material to consumers that animals not be subject to factory-farm conditions; and that (3) accordingly, consumers are willing to pay a premium for "natural" meat products.

42.     According to a 2016 survey conducted by Consumer Reports, 68% of consumers reported being extremely or very concerned that routinely feeding healthy animals antibiotics and other drugs may allow animals to be raised in crowded and unsanitary conditions; 65% reported being extremely or very concerned that such feeding practices create new bacteria that cause illnesses antibiotics will be unable to cure; and 53% reported being extremely or very

8

concerned that those same practices lead to environmental pollution. *See:* http://goo.gl/R1ewZ3, last visited June 28, 2016.

43.     In that same survey, nearly two-thirds of consumers stated  they think a claim that a product contains "no nitrates" means *no nitrates*, whether from an artificial or natural source, were used at all in the product's production. *See: id.*

44.     In a 2015 Consumer Reports survey, consumers believed the following about meat and poultry products dubbed "natural":

>    (a) The animals were given no artificial growth hormones (64%);
>
>    (b) No artificial ingredients or colors were added (65%);
>
>    (c) The animals' feed contained no artificial ingredients or colors (61%);
>
>    (d) The animals' feed contained no GMOs (59%);
>
>    (e) No antibiotics or other drugs were ever used (57%); and
>
>    (f) The animals went outdoors (50%).

*See:* https://goo.gl/kC16HY, last visited June 28, 2016.

45.     The same Consumer Reports survey also found that it is important to consumers that food not be produced via standard factory farm methods. For example, 82% of consumers said it was "important" or "very important" to reduce antibiotic use in food production; 84% said the same about improving living conditions for animals. *See: id.*

46.     The survey also found that 62% of consumers purchase "natural" products, and 87% of those purchasers are willing to pay more for products called "natural" if they met their expectations as to what "natural" means. *See: id.* The 2016 Consumer Reports survey found the number of consumers who purchase "natural" products to be as high as 73%. *See:* http://goo.gl/R1ewZ3, last visited June 28, 2016.

47.     The results of the 2015 Consumer Reports survey are consistent with an earlier, similar Consumer Reports survey that concluded that most consumers believe "natural" means the animals were not raised in industrial, factory-farm conditions.

48.     Reasonable consumers—indeed, most consumers—think it is important that animals raised for food be raised without antibiotics, outside of factory farms, and in comfortable living conditions. Reasonable consumers believe "natural" means just that.

## II.     HORMEL'S NATURAL CHOICE PRODUCTS AND "MAKE THE NATURAL CHOICE" ADVERTISING CAMPAIGN

49.     Seeking to take advantage of these consumer desires, Hormel launched its Natural Choice line of lunchmeats and bacon in 2006.

50.     Today, consumers can purchase prepackaged Natural Choice turkey, chicken, beef, and ham lunchmeats in various flavors, as well as several types of bacon.

51.     Natural Choice products are available in grocery stores nationwide, including in the District of Columbia.

### A.     "Natural Choice" Within Hormel's Business.

52.     The Natural Choice product line is an important part of Hormel's overall business.

53.     In its most-recent Annual Report, Natural Choice was the very first product line discussed with shareholders, stating, "With growing consumer demand for nutritious products, it's no wonder Hormel® Natural Choice® meats continue to resonate with many consumers. Hormel® Natural Choice® products are 100 percent natural with zero preservatives and no artificial colors or MSG, no added nitrates or nitrites*, and no gluten-containing ingredients." (The asterisk next to nitrates leads to a disclaimer "except those naturally occurring.") *See:* http://www.nasdaqomx.mobular.net/nasdaqomx/7/3483/4976/, last visited June 28, 2016.

10

54.     That same 2015 report touted how Natural Choice is one of Hormel's "[t]rusted" brands and is a part of Hormel's effort "to meet the growing consumer demand for items" that are perceived as natural and organic. *See: id.*

55.     In its 2014 Annual Report, Hormel described its Natural Choice line as "one of our fastest growing brands." *See:* http://www.nasdaqomx.mobular.net/nasdaqomx/7/3422/4912/, last visited June 28, 2016.

56.     In its 2013 Annual Report, Hormel again explained, "With a growing consumer demand for healthy, natural, and sustainable products, it's no wonder Hormel® Natural Choice® is one of our fastest growing brands." *See:* http://www.thomson.mobular.net/thomson/7/3372/4805/, last visited June 28, 2016.

57.     Hormel reported "particularly strong growth in Hormel® Natural Choice® deli meats" in both its 2012 and 2013 reports. *See: id.; see also:* http://www.thomson.mobular.net/thomson/7/3322/4685/, last visited June 28, 2016.

58.     In both its 2015 and 2014 Annual Reports, Hormel stated that it planned to "increase[] advertising support" for Natural Choice meats. *See:* http://www.nasdaqomx.mobular.net/nasdaqomx/7/3422/4912/, last visited June 28, 2016; *see also:* http://www.nasdaqomx.mobular.net/nasdaqomx/7/3483/4976/, last visited June 28, 2016.

59.     Hormel reported that, in the 2015 fiscal year, its refrigerated foods section, of which the Natural Choice line is a part, brought in $4.4 billion in net sales. *See:* http://www.nasdaqomx.mobular.net/nasdaqomx/7/3483/4976/, last visited June 28, 2016.

**B.     The "Natural Choice" Advertising Campaign.**

60.     In May 2015, Hormel began advertising Natural Choice products nationwide under the slogan "Make the Natural Choice."

61.     These "Make the Natural Choice" advertisements appear in magazines, in newspaper inserts, and on the internet.

62.     Hormel also maintains a website for the brand, www.makethenaturalchoice.com, and advertises Natural Choice on Facebook, Twitter, YouTube, and Pinterest through Natural Choice pages, channels, and boards.

63.     In general, Hormel's print advertisements claim that Natural Choice products are "natural," "all natural," or "100% natural"; have no added nitrates or nitrites; and have no added preservatives.

64.     Beyond a package reproduction, the print advertisements contain no language defining or describing the meaning of "natural," "all natural," or "100% natural" or the meaning of "no nitrates or nitrites added."

65.     For example, one of its magazine advertisements from 2015 contains a photograph of Natural Choice Honey Deli Ham and states, "PRESERVE YOUR RIGHT to no preservatives. Say **NO** to sodium benzoate & sodium diacetate. Things only a chemist would love. Say **YES** to natural lunchmeat with flavors like Cherrywood, Cracked Pepper, or Sriracha. Things Mother Nature would love! Now that you know, it's easy to MAKE THE NATURAL CHOICE.com":



66.     Another 2015 magazine advertisement tells consumers they can buy "natural"

products at "**affordable**" prices by "MAK[ING] THE NATURAL CHOICE.COM":



67.     One of Hormel's newspaper inserts from 2015 contains a small reproduction of Natural Choice Honey Deli Ham package and exhorts consumers to "BITE FOR YOUR RIGHTS! SAY NO TO PRESERVATIVES. You have the right to say no to the bad stuff, and yes to tasty lunchmeat that's all natural with no preservatives. Now that you know, it's easy.



MAKE THE NATURAL CHOICE.com."

68.     The Natural Choice website, www.makethenaturalchoice.com, urges consumers

to "Make the Natural Choice" and purchase Hormel's products.

69.     Among other things, the homepage urges consumers to "Layer on the turkey. Pass on the preservatives," and to add "Extra chicken. Nix the added nitrates."

70.     The "Our Story" portion of the website discusses the "higher standards" that Natural Choice products meet and touts Hormel's commitment to sustainability and the "wholesome" nature of Natural Choice products.



71.     The webpage also states, "We're committed to delivering a consistent, honest product made with clean ingredients. Where nothing is hiding and no one is left wanting"; as well as, "We find pleasure in the simplicity of the brand and the product itself. It has integrity: safe, clean, great taste."

16



72.    The webpage also boasts that the primary ingredients are all sourced and processed within a 400-mile radius.

73.    This sourcing and processing message is accompanied by links to information on Hormel's environmental sustainability efforts:







74.     In addition to its print and online marketing, Hormel has developed video advertisements promoting its Natural Choice products.

75.     In one such advertisement, titled "Judy's Guests Let It All Hang Out," actress Judy Greer is throwing a party for local "naturalists" and, therefore, is serving "preservative-free" Hormel Natural Choice lunchmeat products. Ms. Greer, believing that the "naturalists" are

19

"into birds or something," is then surprised to learn that they are in fact nudists.

76.     The implication and innuendo of the video advertisement is that it is appropriate to serve Natural Choice products, which purportedly are "natural" and free of preservatives and artificial ingredients, to individuals who care about nature and purity. *See:* http://bit.ly/1f46s4a, last visited June 23, 2016; *see also:* https://www.youtube.com/watch?v=j4cwzC5UydQ, last visited June 23, 2016.

77.     In another video advertisement, Judy Greer eats Hormel Natural Choice lunchmeat in a hospital room with a woman giving birth. The woman giving birth complains that she has not been able to eat lunchmeat while pregnant, and Ms. Greer then explains that Natural Choice contains "no preservatives."

78.     The implication and innuendo from this advertisement is that, because Natural Choice products do not contain preservatives—at least according to the advertisement—they do not pose the health risks that other lunchmeats do. *See:* https://www.youtube.com/watch?v=-yAAYZduxGc, last visited June 23, 2016.

### III.     HORMEL'S PRODUCTION PRACTICES

79.     Hormel underscores its "natural" claims with assertions that Natural Choice products are "clean" and "honest," reflecting "simplicity" and consumers' "wholesome" expectations. There is nothing natural, clean, honest, simple, or wholesome about how Hormel produces Natural Choice.

80.     Hormel's operations, including those used for its Natural Choice products, are quintessential examples of industrial animal agriculture.

81.     Hormel is an integrator; that is, a vertically integrated company owning the contracts for sale, as well as the processing facilities, slaughterhouses, and, in some instances,

"farms" on which the animals are born and raised.

82.     Hormel owns some of the pigs and turkeys that end up in Natural Choice products. Where Hormel does not directly own the animals and facilities for raising them, it enters into detailed contracts with suppliers, providing precisely how the animals are to be bred, contained, fed, cared for, and treated.

83.     As a result of Hormel's conduct or directives, its animals, including those used for its Natural Choice meats, are treated in the most unnatural of manners from birth through slaughter.

84.     Hormel and its suppliers employ what are known as factory farming techniques, using homogenization, mechanization and pharmaceuticals—such as antibiotics and growth enhancers—to limit costs and increase profits.

85.     Factory farming, as practiced by Hormel and its suppliers, involves packing animals into cramped, unsanitary settings, in many cases so small the animals are barely able to move.

86.     Because the animals' natural instincts would typically make such constraints untenable, Hormel and its suppliers mutilate the animals and trap them indoors in tight cages.

87.     In addition, Hormel and its suppliers administer a variety of pharmaceuticals, including antibiotics and hormones, in an effort to ward off the diseases apt to run through such densely packed populations and to further increase the rate and/or amount of meat that the animals produce.

88.     Only months after their births, the animals are slaughtered on an assembly line, where the focus is speed, not accuracy or welfare, sometimes resulting in still-conscious animals being skinned, scalded, de-feathered, or dismembered, among other horrors.

21

89.     Hormel's Natural Choice advertisements are materially false and tend to mislead because the animals are born, raised, and killed in unnatural, unsafe, and cruel conditions that do not comport with reasonable consumers' perceptions of "natural" meat, as evidenced by numerous surveys.

90.     Hormel's material misrepresentations regarding its Natural Choice products do not end with how the animals were grown and slaughtered, but include how the meat is then processed.

91.     Hormel advertises its Natural Choice products as free of additives and preservatives, stating only that they "may contain naturally occurring nitrates and nitrites, but none are added."[2]

92.     In actuality, as discussed above, Hormel adds cultured celery juice powder to its Natural Choice products, which it admits is due to the "high amounts of nitrites" contained in the juice powder.[3]

93.     Contrary to Hormel's advertisements, most Natural Choice products *also* contain a bacterial culture.

94.     Celery juice powder itself is loaded with nitrates and is considered a preservative.

95.     When "cultured," the nitrates in celery juice powder are converted into sodium nitrite, also a preservative.

96.     Hormel's express advertising claims that its products contain no added nitrates or nitrites and no preservatives, then, are simply false, and the Natural Choice products do not have the characteristics and ingredients advertised.

---

[2] *See:* http://www.makethenaturalchoice.com/Ingredients, last visited June 27, 2016.

[3] *See:* http://www.makethenaturalchoice.com/Ingredients/Nitrates-in-your-lunch-Do-you-know-what-they-do, last visited June 28, 2016.

**A.    Hormel's Natural Choice Products Contain the Same Factory-Farmed Meats as Its Other Product Lines.**

97.    On information and belief, Hormel does not differentiate among the animals any of its producers raise for its various product lines.

98.    A pig turned into Spam could have been trapped in the same cages or cramped and filthy barns, fed the same antibiotics and other drugs, and suffered the same torturous slaughter as a pig that became Natural Choice lunchmeat.

99.    In fact, Hormel's own corporate presentation suggests that the loin that becomes Natural Choice meat and the belly that is sold without any claim of it being "natural" could have come from the *same* pig.[4]

100.    Hormel's entire objective is to make all of the animals used for it products as similar as possible, so that they can be killed and dismembered faster.

101.    Hormel is structured to minimize the differences among animals used for its product lines, not to generate different meat for its different lines.

102.    On information and belief, Hormel's animal-raising specifications do not vary based on which product the animal will become.

103.    For example, Hormel's contract pig producers are paid, in part, based on how closely the animals they raise meet a target within a matrix.

104.    That matrix takes into account the pig's weight and back fat.

105.    However, the goal is not to maximize weight or minimize fat, but to make the animals as uniform as possible.

106.    Through such uniformity, Hormel can run its processing lines faster.

---

[4] *See:* http://library.corporate-ir.net/library/71/712/71258/items/168828/Ray-updated.pdf, last visited June 27, 2016.

23

107.    On information and belief, Hormel has no system to identify which animals come from which producers or the conditions in which the animals were raised.

108.    Indeed, the following is true with regard to Hormel's pork products:

(a)    Hormel's 2015 report to the Securities and Exchange Commission ("Form 10-K") lists only three "harvesting," *i.e.*, slaughter, plants for its pork "refrigerated foods" lines, which include Natural Choice products. Those plants are the "Quality Pork Processors" ("QPP") plant in Austin, Minnesota, a second plant in Fremont, Nebraska, and a third plant in Vernon, California. Based on the square footage listed in Hormel's 2015 10-K, the Vernon, California plant accounts for less than 30% of Hormel's production from these three facilities. In other words, at the very least, the other plants are producing a sizeable amount of the pork that becomes Natural Choice meat.

(b)    On information and belief, neither the QPP nor Fremont plant has a system in place to identify the source of the animals being slaughtered.

(c)    Indeed, on information and belief, Hormel instructs all of the trucks delivering pigs to be slaughtered at the QPP and Fremont plants to arrive before the shift begins. Hormel makes no effort to stagger the trucks based on where they come from or identify the pigs the trucks carry once they are in line. Trucks are unloaded in the order in which they arrive, but that is determined by happenstance.

109.    In light of the above, the animals raised in the most horrendous conditions and regularly fed pharmaceutical antibiotics and growth enhancers are just as likely to end up in

Hormel's supposedly premium product lines, like Natural Choice, as they are in any of its other products.

110.    Hormel treats all of its animals as interchangeable.

111.    The meat that Hormel advertises as "natural," and which reasonable consumers who desire "natural" products purchase under the belief that the "natural" moniker means the animals were raised and slaughtered in natural and humane conditions, was actually produced under the same unnatural conditions as Hormel's other product lines.

112.    Moreover, since all of these animals are slaughtered in the same plant, by the same workers, with the same training and objectives, the Natural Choice animals are subject to the same cruelty as the animals used in the other product lines produced at QPP and Fremont.

**B.      Hormel's Natural Choice Advertisements Are Materially False and Tend to Mislead, Because the Animals Are Raised in Entirely Unnatural Settings.**

113.    Reasonable consumers believe that meat advertised as "natural" came from animals that were raised in natural conditions.

114.    Hormel anticipates and seeks to benefit from this understanding as it represents and implies that its Natural Choice products come from sustainable farms. For instance, it advertises its products as "wholesome" and seeks to portray them as pure.

115.    In the most recent Consumer Reports survey, 50% of consumers understood the representation or implication that meat was "natural" to mean that the animals were provided access to the outdoors, living as animals would in nature, or at the very least with access to pasture. *See:* http://goo.gl/R1ewZ3, last visited June 28, 2016.

116.    Reasonable consumers expect and consider it to be material—that is, they factor it into their purchasing decision—that Natural Choice products are derived from animals who were provided access to the outdoors, were given opportunities to graze or forage, and were treated in

25

traditional, "wholesome" manners.

117. However, on its website, Hormel admits that its hogs and turkeys, both of which end up in its Natural Choice products, are raised indoors, potentially never touching grass or feeling direct sunlight.[5]

118. Indeed, images from hog farms in Hormel's supply chain show barn walls covered with planks meant to block out the sun,[6] a typical factory-farming technique intended to disrupt the animals' circadian rhythms so that they will stay awake longer, eating more, and fattening faster.

119. An eyewitness account of New Fashion Pork, a major Hormel supplier, describes that inside such barns the pigs stand on wood slats onto which they defecate, covering their feet and haunches with feces and clogging the air with powdery manure aerosol.[7]

120. The animals are given barely enough room to move. Hormel's pigs are born and weaned in facilities that contain thousands of sows and tens of thousands of piglets.[8]

121. Video from a Hormel pig breeder shows so many piglets dumped into a plastic crate that they can barely touch the bottom, having to step on and crawl over one another to move.[9]

122. Piglets who are not strong enough are disposed of through "thumping," a process

---

[5] *See:* https://www.hormelfoods.com/About/CorporateResponsibility/Animal-Welfare, last visited June 28, 2016.

[6] *See:* http://www.peta.org/blog/progress-hormel-pigs/, last visited June 27, 2016.

[7] *See:* http://archive.onearth.org/articles/2014/02/factory-farms-are-poisoning-iowa-water, last visited June 28, 2016.

[8] *See:* http://www.motherjones.com/environment/2014/10/hog-hell-inside-story-peta-investigation-mowmar-farms, last visited June 27, 2016.

[9] *See:* http://cok.net/news/press-releases/cruelty-hawkeye-hormel-supplier/, last visited June 28, 2016.

26

in which the piglet is held by his hind legs and smashed head first into a concrete floor to crush his skull.[10]

123.    The piglets who survive are transferred to similarly over-crowded metal pens, where they spend the remainder of their short lives.[11]

124.    Breeding sows are treated even worse than the pigs headed directly for slaughter. Hormel continues to confine sows to gestation crates.[12]

125.    Gestation crates are two-foot-wide metal cages set side-by-side on a wood slat floor, which keep the sows in a prone position, preventing them from even being able to turn around.

126.    The sows are immobilized in this manner throughout their pregnancy, resulting in well- documented psychological disorders.

127.    The sows end up gnawing on the metal bars, waving their heads constantly, or lying motionless on the manure-encrusted floor.[13]

128.    Hormel admits on its website that the sows it directly owns will not fully "transition[] to group sow housing," *i.e.*, be freed from gestation crates, until 2018, and indicates by omission that Hormel's contract suppliers may continue to use gestation crates after 2018.[14]

---

[10] *See:* http://www.motherjones.com/environment/2014/10/hog-hell-inside-story-peta-investigation-mowmar-farms, last visited June 27, 2016.

[11] *See:* http://archive.onearth.org/articles/2014/02/factory-farms-are-poisoning-iowa-water, last visited June 28, 2016.

[12] *See:* http://www.austindailyherald.com/2015/01/hormel-shareholders-meeting-income-and-company-practices-among-shareholder-concerns/, last visited June 23, 2016.

[13] *See:* http://www.humanesociety.org/issues/confinement_farm/facts/gestation_crates.html, last visited June 28, 2016.

[14] *See:* https://www.hormelfoods.com/About/CorporateResponsibility/Animal-Welfare, last visited June 28, 2016. Confirming that Hormel's suppliers employ gestation crates, Hormel has faced a shareholder

129.   By blanketing its campaign with such forward-looking statements, Hormel attempts to hide the reality of its current production methods.

130.   In order to maintain the pigs in such conditions, Hormel and its suppliers turn to mutilation.

131.   Because of the intensive confinement in the barns, pigs sometimes bite one another's tails.

132.   Hormel fears that bitten tails will become infected by the fecal matter in the air and on the ground, as well as other contaminants.

133.   Hormel and its suppliers cut off the pigs' tails, a practice called tail docking.

134.   Hormel knows that tail docking will not actually prevent tail biting.

135.   One study has shown that tail docking causes a three-fold increase in tail biting.[15]

136.   However, because tail docking makes tail biting intensely painful, Hormel expects pigs to avoid the biters, which is essentially impossible given the confined conditions.[16]

137.   Turkeys are similarly subject to such claustrophobic conditions.

138.   Minnesota Turkey, a group representing turkey growers that raise birds for Hormel and others, proudly declares that 450 farms grow around 46,000,000 turkeys annually, meaning that on average more than 100,000 birds pass through each farmer's barns each year.[17]

139.   As shown by its advertising, Hormel knows that reasonable consumers actively

---

resolution calling on it to disclose the amount of financial risk it faces from working with suppliers who use such devices.

[15] *See:* http://www.nytimes.com/2005/03/07/opinion/the-unkindest-cut.html?_r=0, last visited June 28, 2016.

[16] *See: id*; *see also:* http://cok.net/news/press-releases/cruelty-hawkeye-hormel-supplier/, last visited June 28, 2016.

[17] *See:* http://minnesotaturkey.com/turkeys/fun-facts/, last visited June 28, 2016.

seek out "natural" meat products.

140.   Hormel knows that reasonable consumers attach importance to Hormel's misrepresentations regarding the conditions under which the animals used for Natural Choice meat were raised and consider those conditions to be material to their purchasing decisions.

141.   Hormel also knows that reasonable consumers, in making their purchasing decisions, attach importance to Hormel's misrepresentations and misleading innuendo that the animals were treated and raised based on their needs and instincts, that is, with the opportunity to roam outdoors and express natural behaviors.

142.   Simply put, nothing about the factories in which Hormel and its suppliers breed and raise the animals is "natural."

143.   Nonetheless, Hormel promotes these products as "natural" and sells without the intent to sell them as advertised.

144.   Thus, Hormel's misrepresentations and omissions about the conditions under which the animals are raised are materially false and tend to mislead.

C.   **Hormel's Natural Choice Advertisements Are Materially False and Tend to Mislead, Because the Animals Are Raised with Hormones, Antibiotics, and Growth Enhancers, Including Ractopamine.**

145.   A majority of consumers expect that the animals used to produce meat advertised as "natural" are not drugged to make them grow faster and larger on less feed.

146.   Sixty-four percent of consumers believe that animals used to produce "natural" meat were not fed artificial growth hormones. *See:* https://goo.gl/kC16HY, last visited June 28, 2016.

147.   Sixty-one percent of consumers believe that animals used to produce "natural" meat were not fed artificial ingredients. *See: id.*

29

148.    Fifty-seven percent of consumers believe that animals used to produce "natural" meat were not given antibiotics or other drugs to increase the animals' growth. *See: id.*

149.    However, these perceptions do not match Hormel's reality.

150.    Hormel's animals are raised with antibiotics, ractopamine—a growth promoting beta agonizer carrying dire consequences for the animals' welfare—and/or hormones.

151.    Thus, Hormel's advertising representations, that its products are "natural," are materially false and misleading.

152.    Hormel has privately acknowledged that the pigs and cows that go into its Natural Choice products are grown with hormones.[18]

153.    While under federal law, pigs cannot be fed hormones, the same cannot be said for cattle, and the "no hormones" statement is conspicuously absent from the Natural Choice roast beef label.

154.    Hormel also pioneered the use of antibiotics to increase the speed with which piglets could be weaned from their mothers and their market weight.[19]

155.    Hormel now claims it only uses antibiotics when they serve a medical purpose, such as to treat infections brought on by the toxic environment in which the animals are raised.

156.    However, Hormel actually adheres to the antibiotic protocols in the National Pork Board's Pork Quality Assurance Plus program, which allow antibiotics to be used prophylactically for "disease prevention," allowing healthy animals to be dosed with

---

[18] *See:* http://brucebradley.com/food/all-natural-%E2%80%A6-really-hormel-natural-choice-deli-meats/, last visited June 28, 2016.

[19] *See:* http://www.commondreams.org/views/2014/10/19/little-piggy-bred-superbug, last visited June 28, 2016.

antibiotics.[20]

157.    Investigative reporters who have studied Hormel's pork processing and its producers have suggested that Hormel uses "antibiotics and growth enhancers" to ensure the animals grow at the same rate and reach the same target weight at the same time.[21]

158.    Some Hormel suppliers who contend they do not use antibiotics for growth, such as New Fashion Pork, instead employ ractopamine.[22]

159.    Ractopamine, commonly sold as a feed additive under the name Paylean, is a regulated drug that maximizes lean muscle growth and thereby produces more marketable meat.[23]

160.    Because of the risks associated with ractopamine for both pigs and humans, 160 countries, including China, Russia, and the European Union, have banned meat products that contain the drug. [24]

161.    Among other concerns, ractopamine has been associated with creating downer animals (animals too sick or weak to stand and walk to slaughter) and increased heart rates in humans.[25]

162.    The Sichuan Pork Trade Chamber of Commerce in China concluded that between

---

[20] *See:* https://www.hormelfoods.com/About/CorporateResponsibility/Animal-Welfare, last visited June 28, 2016.

[21] *See:* http://www.motherjones.com/tom-philpott/2014/10/chain-ted-genoways-spam-hormel, last visited June 28, 2016.

[22] *See:* http://archive.onearth.org/articles/2014/02/factory-farms-are-poisoning-iowa-water, last visited June 28, 2016.

[23] *See:* http://www.centerforfoodsafety.org/files/ractopamine_factsheet_02211.pdf, last visited June 28, 2016.

[24] *See: id.*

[25] *See: id.*

1998 and 2010, 1,700 people were poisoned from eating ractopamine-contaminated pork.[26]

163.   In 2014, China banned pork produced at Hormel's QPP and Fremont plants, because Hormel and/or its suppliers used ractopamine, and Hormel's production facilities could not differentiate between the different types of animals slaughtered at the facilities.[27]

164.   On information and belief, the pigs slaughtered at QPP continue to regularly show signs that they have been raised with ractopamine.

165.   Pigs are shocked before slaughter.

166.   When electrocuted, animals that are fed ractopamine shatter into pieces because their bones have been weakened by the drug.

167.   On information and belief, this is a regular occurrence at QPP.

168.   When Hormel represents that its products are "natural," a material component and implication of that claim is that the animals used to generate the meat were not fed medically unnecessary drugs to increase their weight and speed of growth.

169.   Hormel's Natural Choice advertisements tend to mislead, because they misrepresent and omit the fact that the products actually come from animals fed medically unnecessary drugs and hormones.

170.   The products do not have the qualities, characteristics, ingredients, or benefits that consumers expect and rely upon, and Hormel never intended to sell them as advertised.

---

[26] *See: id.*

[27] *See:* http://www.bloomberg.com/news/articles/2015-10-22/china-agrees-to-lift-restrictions-on-u-s-pork-processing-plants, last visited June 23, 2016; *see also:* http://www.reuters.com/article/us-china-pork-additive-idUSKBN0GC20Y20140812#Rsf0DYBwAGKU3Bc0.99, last visited June 23, 2016.

**D.      Hormel's Natural Choice Advertisements Are Materially False and Tend to Mislead Because the Animals Are Tortured during Slaughter, and the Meat They Generate Is Contaminated with Fecal Matter, Hair, Nails, and Other Items.**

171.    The claim that a product is "natural" also indicates, to a reasonable consumer, that the animals used in a food product were treated appropriately throughout their lives.

172.    As described above, half of consumers believe that animals used to produce "natural" meat were allowed act and move according to their instincts, including outdoors.

173.    Hormel underscores its "natural" claims by advertising its Natural Choice products as "wholesome," "clean," "made from clean ingredients," "honest," "safe," and meet "higher standards."

174.    The belief that the animals used in products advertised as "natural," "wholesome," "clean," "honest," "safe," and of "higher standards" were not abused, were properly cared for, and were slaughtered in a sanitary and humane way, is material to a reasonable consumer's decision to buy Natural Choice.

175.    With Hormel's Natural Choice line, the reasonable consumer's material belief is simply not the case.

176.    At least two of Hormel's slaughter facilities where Natural Choice pork products are produced, including QPP, are part of a USDA pilot program that allows faster line speeds with fewer inspectors.[28]

177.    Put another way, QPP has special permission to kill and dismember pigs at a faster rate and with less oversight than almost any other slaughterhouse.

178.    In order to maximize this competitive advantage, USDA inspectors describe that

---

[28] *See:* http://cok.net/inv/hormel/hormel-himp/, last visited June 28, 2016.

employees are QPP "are discouraged from removing adulterated products from the line."[29]

179.   One USDA inspector at QPP "witnessed company employees personally condemn the plant's products and then attempt to sneak the condemned carcasses past me when I turned away. The company threatens plant employees with terminations if they see them condemning too many carcasses or carcass parts."[30]

180.   "[W]ith line speeds running as fast as they do," "it's difficult for inspectors to be able to do th[eir] job[s]" and compensate for QPP's poor self-monitoring.[31]

181.   QPP employees have even refused to remove meat from the line that USDA has ruled not fit for human consumption.[32]

182.   Accordingly, pig carcasses processed at QPP are dragged through the animals' own bodily fluids, contaminating the meat, but those carcasses are allowed to remain on the processing line.[33]

183.   At QPP, "fecal contamination has increased."[34]

184.   An investigator recently documented "countless" carcasses covered with

---

[29] *See:* http://www.foodwhistleblower.org/wp-content/uploads/2015/01/Affidavit-2-Redacted_.pdf at 2, last visited June 28, 2016.

[30] *See:* http://www.foodwhistleblower.org/wp-content/uploads/2015/01/Affidavit-3-Redacted_1.pdf at 3, last visited June 28, 2016.

[31] *See:* http://www.foodwhistleblower.org/wp-content/uploads/2015/01/Affidavit-2-Redacted_.pdf at 2, last visited June 28, 2016.

[32] *See:* http://www.foodwhistleblower.org/wp-content/uploads/2015/01/Affidavit-3-Redacted_1.pdf at 6, last visited June 28, 2016.

[33] *See:* http://www.foodwhistleblower.org/wp-content/uploads/2015/01/Affidavit-2-Redacted_.pdf at 3, last visited June 28, 2016.

[34] *See:* http://www.foodwhistleblower.org/wp-content/uploads/2015/01/Affidavit-3-Redacted_1.pdf at 4, last visited June 28, 2016.

abscesses and feces at QPP.[35]

185.   USDA inspectors at QPP have also observed a higher rate of "hair, toenails, cystic kidneys, and bladder stems" making their way into the processing line, but the line is "running so fast it is impossible" to catch all such instances before the carcasses are turned into processed meat.[36]

186.   Those same inspectors have also observed an increased number of carcasses with "bruising and blood clots . . . which provides a growing medium for bacteria."[37]

187.   Likewise, diseased animals are sent through the line.[38]

188.   A USDA inspector at QPP summed it up, "Personally, I will not eat any products that bear the name of the company [Hormel] for which this meat is produced—I don't think that it is wholesome or safe to consume."[39]

189.   These horrendous conditions affect not only the contents, health, and safety of the end product, but also the treatment of the animals in their final moments.

190.   A recent undercover investigation of QPP captured pigs, including sick downer animals, being beaten and dragged by metal hooks inserted into their jowls in an effort to get them into the processing line faster.[40]

---

[35] *See:* http://cok.net/inv/hormel/, last visited June 28, 2016.

[36] *See:* http://www.foodwhistleblower.org/wp-content/uploads/2015/01/Affidavit-2-Redacted_.pdf at 3-4, last visited June 28, 2016.

[37] *See:* http://www.foodwhistleblower.org/wp-content/uploads/2015/01/Affidavit-2-Redacted_.pdf at 3, last visited June 28, 2016.

[38] *See:* http://www.foodwhistleblower.org/wp-content/uploads/2015/01/Affidavit-3-Redacted_1.pdf at 5, last visited June 28, 2016.

[39] *See:* http://www.foodwhistleblower.org/wp-content/uploads/2015/01/Affidavit-4-%E2%80%93-Joe-Ferguson.pdf at 1-2, last visited June 28, 2016.

[40] *See:* http://cok.net/inv/hormel/, last visited June 28, 2016.

191. That same video captured QPP employees acknowledging that, although the animals are supposed to be stunned before slaughter, workers frequently fail to properly shock the animals, meaning the pigs feel their throats being slit.[41]

192. Such animals can remain conscious as they are dismembered, a process that includes dunking them in a scalding water tank.[42]

193. Even Hormel acknowledges that these actions are "appalling and completely unacceptable."[43]

194. The animals used to produce Hormel's Natural Choice meat and other products are not treated as sentient beings, but objects to be disposed of however Hormel sees fit, regardless of the pain inflicted. Further, the slaughtering process is unsanitary.

195. For these reasons, Hormel's claims that its Natural Choice products are natural, which it reinforces with assurances that the products are clean, honest, safe, and wholesome, are materially false and tend to mislead.

196. Through its advertisements and claims, Hormel is misrepresenting, making misleading implications and innuendos, and omitting information regarding its treatment of the animals during slaughter.

197. The products do not have the characteristics, ingredients, benefits, standards, qualities, or grades that consumers expect and rely upon, and Hormel never intended to sell them as advertised.

---

[41] *See: id.*

[42] *See: id.*

[43] *See:* https://www.washingtonpost.com/news/wonk/wp/2015/11/11/that-one-was-definitely-alive-an-undercover-video-at-one-of-the-fastest-pork-processors-in-the-u-s/, last visited June 28, 2016.

**E.**    **Hormel's Natural Choice Advertisements Are Materially False and Tend to Mislead, because They Expressly Misrepresent that the Products Do Not Contain Preservatives or Added Nitrates and Nitrites.**

198.    Hormel expressly markets its Natural Choice products as containing "[n]o preservatives, no added nitrates or nitrites[], and no artificial colors or flavors–that's what makes each and every product in the Hormel Natural Choice line taste so good."[44]

199.    On Hormel's Facebook page, in response to a direct inquiry, Hormel assured customers that "Natural Choice is nitrate free!"

200.    Despite these unequivocal statements, another advertisement qualifies the extent to which Natural Choice produces are actually "nitrate free," stating that "Hormel® Natural Choice® products may contain naturally occurring nitrates and nitrites, but none are added."[45]

201.    In fact, none of these representations is true.

202.    Most of Hormel's Natural Choice products list cultured celery juice powder among their ingredients.

203.    While it might appear to be an innocuous ingredient to an unsuspecting consumer seeking nitrate-free meat, in fact, celery juice powder is a nitrate salt, which reacts in the human body the same way chemical nitrates do.[46]

204.    Hormel acknowledges that the only reason to add celery juice powder is the "high amounts of nitrites" in the powder, which allow the powder to act as "an excellent meat

---

[44] *See:* http://www.hormel.com/Brands/NaturalChoice/NaturalChoiceInfoLightbox.aspx, last visited June 28, 2016.

[45] *See:* http://www.makethenaturalchoice.com/Ingredients, last visited June 27, 2016.

[46] *See:* http://www.lamag.com/digestblog/a-scientist-who-worked-on-the-whos-report-on-red-and-processed-meats-answers-all-your-burning-questions-about-carnivorism-and-cancer, last visited June 28, 2016.

*preserver*" (emphasis added).[47]

205.    Further, in addition to the celery juice powder, Hormel adds a bacterial culture to most Natural Choice products, which breaks down the nitrates in celery juice powder into nitrites, which are also preservatives.

206.    In short, Hormel's claims that its Natural Choice products are nitrate- and nitrite-free, contain no added nitrates, and contain no preservatives, are false and misleading, omitting accurate information.

207.    Hormel purposefully adds nitrates and preservatives to its Natural Choice products.

208.    Information contradicting Hormel's pervasive advertising is difficult for the average consumer to find and requires special knowledge, such as understanding the composition and chemistry of celery juice powder.

209.    Therefore, Hormel's "natural" advertising representations are materially deceptive and misleading.

210.    The products do not have the characteristics, ingredients, benefits, standards, qualities, or grades that consumers expect and rely upon, and Hormel never intended to sell them as advertised.

## CAUSE OF ACTION

## VIOLATIONS OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT

211.    Plaintiff incorporates by reference all the allegations of the preceding paragraphs of this Complaint.

212.    Hormel's "Make the Natural Choice" advertising campaign, which includes print,

---

[47] *See:* http://www.makethenaturalchoice.com/Ingredients/Nitrates-in-your-lunch-Do-you-know-what-they-do, last visited June 28, 2016.

web, and video advertisements about its Natural Choice lunchmeat and bacon products, misrepresents, tends to mislead, and omits facts regarding the raising, slaughter, and processing of Natural Choice meat and makes misrepresentations, makes misleading statements, and contains omissions about the additional ingredients added to Natural Choice products.

213.   Hormel's misleading advertising includes statements that Natural Choice products are "natural," "all natural," and "100% natural," which it bolsters with claims that the products are "clean," "wholesome," "safe," "honest," and held to "higher standards"; that the products do not contain "preservatives," "nitrates," or "nitrites"; and that "preservatives," "nitrates," and "nitrites" are not added to the products.

214.   Hormel's advertising makes representations and uses innuendo that tends to mislead reasonable consumers into believing that the animals used to make Natural Choice products are raised humanely and without the use of hormones, antibiotics, and other veterinary drugs for non-therapeutic purposes; that the animals are slaughtered humanely, cleanly, and safely; and that Natural Choice products do not contain preservatives, nitrates, and nitrites. The advertisements omit the truth about Hormel's products.

215.   The Natural Choice products lack the characteristics, ingredients, benefits, standards, qualities, or grades that Hormel states and implies in its advertisements.

216.   This misstatements, innuendo, and omissions are material and have the tendency to mislead.

217.   Hormel never intended to sell its products as advertised.

218.   The facts as alleged above demonstrate that Hormel has violated the District of Columbia Consumer Protection Procedures Act ("DC CPPA"), D.C. Code § 28-3901 *et seq.* Specifically, Hormel has violated D.C. Code § 28-3904, which makes it an unlawful trade

practice to:

(a)    represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; . . .

(d)    represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;

(e)    misrepresent as to a material fact which has a tendency to mislead;

(f)    fail to state a material fact if such failure tends to mislead;

(f-1)   [u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead; ... [or]

(h)    advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered.

219.    The DC CPPA makes such conduct an unlawful trade practice "whether or not any consumer is in fact misled, deceived or damaged thereby." D.C. Code § 28-3904.

220.    Hormel knew or should have known that reasonable consumers would believe that its Natural Choice products were "natural," "all natural," and/or "100% natural" as advertised and underscored by representations that the products are "clean," "honest," "wholesome," of "higher standards," and/or "safe."

221.    Because Hormel's "Make the Natural Choice" advertising campaign misrepresents the characteristics, ingredients, and benefits of Natural Choice products; misrepresents the standard, quality, and grade of Natural Choice products; misrepresents, fails to state, and uses innuendo and ambiguity in ways which tend to mislead reasonable consumers with regard to material facts about Natural Choice products; and advertises Natural Choice

products without the intent to sell the products as advertised, Hormel's Natural Choice advertising violates D.C. Code §§ 28-3904(a), (d), (e), (f), (f-1), and (h).

222. Hormel is a "person" within the meaning of D.C. Code § 28-3901(a)(1), is a merchant under § 28-3901(a)(3), and provides "goods" within the meaning of § 28-3901(a)(7).

223. Pursuant to D.C. Code § 28-3905(k)(1)(C), "[a] nonprofit organization may, on behalf of itself or any of its members, or on any such behalf and on behalf of the general public, bring an action seeking relief from the use of a trade practice in violation of a law of the District, including a violation involving consumer goods or services that the organization purchased or received in order to test or evaluate qualities pertaining to use for personal, household, or family purposes."

224. Via § 28-3905(k)(1)(C), the DC CPPA allows for non-profit organizational standing to the fullest extent recognized by the D.C. Court of Appeals in its past and future decisions addressing the limits of constitutional standing under Article III.

225. Plaintiff ALDF is a "non-profit organization" within the meaning of D.C. Code § 28-3901(a)(14) and is a "person" within the meaning of D.C. Code § 28-3901(a)(1).

226. ALDF brings this Count against Hormel for Hormel's violation of the DC CPPA, D.C. Code § 28-3901 *et seq.*

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff ALDF prays for judgment against Hormel and requests the following relief:

A.    a declaration that Hormel's conduct is in violation of the D.C. CPPA;

B.    an order enjoining Hormel's conduct found to be in violation of the D.C. CPPA, as well as corrective advertising;

41

C.   an order granting Plaintiff costs and disbursements, including reasonable attorneys' fees and expert fees, and prejudgment interest at the maximum rate allowable by law; and

D.   such further relief, including equitable relief, as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 29, 2016

REZVANI VOLIN P.C.

/s/ Tracy D. Rezvani
_____

Tracy D. Rezvani (No. 464293)
trezvani@rezvanivolin.com
Richard M. Volin (No. 457292)
rvolin@rezvanivolin.com
1050 Connecticut Avenue, NW, Suite 500
Washington, DC 20036
Telephone: (202) 350-4270
Facsimile: (202) 351-0544

Kim E. Richman
THE RICHMAN LAW GROUP
81 Prospect Street
Brooklyn, NY 11201
Telephone: (212) 687-8291
Facsimile: (212) 687-8292
krichman@richmanlawgroup.com

David S. Muraskin (No. 1012451)
dmuraskin@publicjustice.net
Leah Nicholls (No. 982730)
lnicholls@publicjustice.net
PUBLIC JUSTICE
1620 L Street NW, Suite 620
Washington, DC 20036
Telephone: (202) 797-8600
Facsimile: (202) 232-7203

*Attorneys for Plaintiff*

42



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

Animal Legal Defense Fund
_____
                                        Plaintiff

                vs.                                    Case Number   2016 CA 004744 B

Hormel Foods Corporation
_____
                                        Defendant

### SUMMONS

To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Tracy D. Rezvani
_____        _Clerk of the Court_
Name of Plaintiff's Attorney

1050 Connecticut Ave N.W., #500          By _____
_____              Deputy Clerk
Address
    Washington, D.C. 20036
_____        Date __06/30/2016_____
    (202) 350-4270
_____
Telephone
如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시요     የምግርጉም ትርጉም ከፈለጉ ለማግኘት (202) 879-4828 ይደውሉ።

        IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Teléfono: (202) 879-1133

Animal Legal Defense Fund

_____
                                    Demandante

contra

Hormel Foods Corporation                       Número de Caso: _____
_____
                                    Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veinte (20) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que Usted le entregue al demandante una copia de la Contestación o en el plazo de cinco (5) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

Tracy D. Rezvani                         _SECRETARIO DEL TRIBUNAL_
_____
Nombre del abogado del Demandante

1050 Connecticut Ave, N.W., #500         Por: _____
_____
Dirección                                              Subsecretario
  Washington, D.C. 20036
_____

  (202) 350-4270                         Fecha _____
_____
Teléfono

如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시오    የአማርኛ ትርጉም ለማግኘት፣ (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO, O SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍAN RETENERLE SUS INGRESOS, O PODRÍAN TOMAR SUS BIENES PERSONALES O RAÍCES Y VENDERLOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO_.

Si desea conversar con un abogado y le parece que no puede afrontar el costo de uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse de otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CASUM.doc

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

Animal Legal Defense Fund

Case Number: __2016 CA 004744 B__

vs

Date: ____6/29/2016____

Hormel Foods Corporation

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)*      Tracy D. Rezvani | Relationship to Lawsuit |
| Firm Name:     Rezvani Volin P.C. | ☒ Attorney for Plaintiff |
| Telephone No.:     Six digit Unified Bar No.: | ☐ Self (Pro Se) |
| (202) 350-4270      464293 | ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury     ☐ 6 Person Jury     ☒ 12 Person Jury

Demand: $_____     Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____     Judge: _____     Calendar #:_____

Case No.:_____     Judge: _____     Calendar#:_____

---

**NATURE OF SUIT:**     *(Check One Box Only)*

**A. CONTRACTS**                 **COLLECTION CASES**

☐ 01 Breach of Contract     ☐ 14 Under $25,000 Pltf. Grants Consent     ☐ 16 Under $25,000 Consent Denied
☐ 02 Breach of Warranty     ☐ 17 OVER $25,000 Pltf. Grants Consent     ☐ 18 OVER $25,000 Consent Denied
☐ 06 Negotiable Instrument     ☐ 27 Insurance/Subrogation     ☐ 26 Insurance/Subrogation
☐ 07 Personal Property               Over $25,000 Pltf. Grants Consent            Over $25,000 Consent Denied
☐ 13 Employment Discrimination     ☐ 07 Insurance/Subrogation     ☐ 34 Insurance/Subrogation
☐ 15 Special Education Fees               Under $25,000 Pltf. Grants Consent            Under $25,000 Consent Denied
                               ☐ 28 Motion to Confirm Arbitration
                                   Award (Collection Cases Only)

---

**B. PROPERTY TORTS**

☐ 01 Automobile     ☐ 03 Destruction of Private Property     ☐ 05 Trespass
☐ 02 Conversion     ☐ 04 Property Damage
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

---

**C. PERSONAL TORTS**

☐ 01 Abuse of Process     ☐ 10 Invasion of Privacy     ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection     ☐ 11 Libel and Slander                   Not Malpractice)
☐ 03 Assault and Battery     ☐ 12 Malicious Interference     ☐ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury     ☐ 13 Malicious Prosecution     ☐ 19 Wrongful Eviction
☒ 05 Deceit (Misrepresentation)     ☐ 14 Malpractice Legal     ☐ 20 Friendly Suit
☐ 06 False Accusation     ☐ 15 Malpractice Medical (Including Wrongful Death)     ☐ 21 Asbestos
☐ 07 False Arrest     ☐ 16 Negligence- (Not Automobile,     ☐ 22 Toxic/Mass Torts
☐ 08 Fraud                      Not Malpractice)     ☐ 23 Tobacco
                                                    ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE        IF USED

# Information Sheet, Continued

## C. OTHERS

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10 Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability
- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

## II.

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

## D. REAL PROPERTY

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

/s/ Tracy D. Rezvani

6/29/2016

_____
Attorney's Signature

_____
Date

CV-496/ June 2015



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

ANIMAL LEGAL DEFENSE FUND
    Vs.                           C.A. No.      2016 CA 004744 B
HORMEL FOOD CORPORATION

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Lee F. Satterfield

Case Assigned to: Judge MAURICE ROSS
Date:  June 30, 2016
Initial Conference: 9:00 am, Friday, September 30, 2016
Location:   Courtroom 100
            500 Indiana Avenue N.W.

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement.  The early mediation schedule shall be included in the Scheduling Order following the ISSC.  Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC."  D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator.  Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/.  To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC.  Two separate Early Mediation Forms are available.  Both forms may be obtained at www.dccourts.gov/medmalmediation.  One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator.  Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W.  Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov.  *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles.  All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation.  D.C. Code § 16-2823(a).  If the parties cannot agree on a mediator, the Court will appoint one.  D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case.  D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation.  D.C. Code § 16-2826.  Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office.  The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc